# STATE OF FLORIDA
# DIVISION OF ADMINISTRATIVE HEARINGS

\*\*,

   Petitioner,

vs.                                                              Case No. 26-0631ERA

PALM BEACH COUNTY SCHOOL
BOARD,

   Respondent.

_____/

## FINAL ORDER

An expedited due process hearing began on March 2, 2026, and concluded on March 30 and 31, 2026. Jessica E. Varn, an Administrative Law Judge (ALJ) with the Division of Administrative Hearings (DOAH), presided over the Zoom conference hearing.

## APPEARANCES

For Petitioner:   Stephanie Langer, Esquire
Langer Law, P.A.
450 State Road 13 North
Suite 106 Box 162
St. Johns, Florida  32259

For Respondent:   Laura E. Pincus, Esquire
School Board of Palm Beach County, Florida
3318 Forest Hill Boulevard, Suite C-331
West Palm Beach, Florida  33406

## STATEMENT OF THE ISSUE

Whether the student's conduct, which violated the Code of Student Conduct (COSC), was a manifestation of the student's disability.

<u>PRELIMINARY STATEMENT</u>

On February 3, 2026, Petitioner filed a request for a due process hearing (Complaint) with the School Board, which was promptly forwarded to DOAH. On February 4, 2026, a Case Management Order was issued, treating the case as an expedited disciplinary case under the Individuals with Disabilities Education Act (IDEA). Later that day, the School Board filed a Point of Clarification, indicating that Section 504 of the Rehabilitation Act of 1973[1] governed the case, and not the IDEA.

The parties next participated in a Zoom pre-hearing conference, wherein the School Board, which contracts with DOAH to hear these types of cases, opted to utilize the IDEA procedural rules for expedited disciplinary matters. Governed by those IDEA procedures, the parties mutually agreed to an expedited hearing date of March 2, 2026.

The parties were unable to complete their presentations on March 2, 2026, and agreed to reconvene on March 30 and 31, 2026. At the beginning of the second day of hearing, counsel for the School Board raised, for the first time, the issue of whether this Order should be a recommended order or a final order. The School Board took the position that this Order should be a recommended order, and Petitioner argued that this Order should be a final order. The undersigned ordered the parties to put their arguments in legal memorandums, due no later than Friday, April 3, 2026. Both parties filed memorandums, which the undersigned considered in making the determination to enter a Final Order.

The Notice of Rights that this Order should include, depending on which type of Order is issued, guides the analysis. In a recommended order, the

---

[1] The Rehabilitation Act of 1973, 29 U.S.C. § 795, *et seq.* (Section 504).

Notice of Rights provides the number of days the parties have to file exceptions to the recommended order. It states that all parties have the right to submit written exceptions within 15 days from the date of a recommended order. Any exceptions to a recommended order must be filed with the agency that will issue the final order in the case.

A Final Order in an IDEA case includes a Notice of Rights that notifies an adversely affected party that they may file a civil action in an appropriate district court of the United States, or an appropriate state circuit court. Since this case is heard by DOAH via contract, the Notice of Rights language in the School Board's policies must be followed. The relevant language is:

> 22. Following the ALJ's decision, *you* may request a review by the full School Board. The School Board cannot reject or modify the findings of fact made in the ALJ's decision, unless the School Board determines the ALJ's findings had no basis in fact, or that the proceedings on which the findings were based did not comply with essential requirements of law.
>
> 23. *Alternatively, you* may request a review of the ALJ's decision by bringing a civil action in a District Court of the United States or State court of competent jurisdiction.

(emphasis added).

The language found in the policies clearly provide parents a choice—to either ask for a review by the School Board, or file an appeal as they are entitled to do with a final order. If a parent opts to have the School Board review the order, there is no mention of filing exceptions to the recommended order.

The School Board, in its memorandum, correctly cites to a Guidance Letter to Broward County, in Complaint #04-09-1279, issued by the United States Department of Education Office for Civil Rights (OCR), in 2013. OCR decided that if any Florida school board contracts with DOAH for its Section 504 hearings, the school board must state, in its procedures, that it will treat the ALJ's Order as a final determination, and that its parties have the same IDEA appeal rights.

Since OCR issued its Guidance Letter in 2013, DOAH has issued Final Orders in Section 504 cases. Based on the language found in the School Board's policies, and supported by OCR Guidance, the undersigned has resolved that this Order should be a Final Order.

The Transcript of the due process hearing memorializes the witnesses who were called to testify and the exhibits admitted into the record. All witness testimony and all exhibits were reviewed and considered, although they may not be mentioned in the Findings of Fact that follow. The two-volume Transcript was filed by April 6, 2026, and the parties were permitted to file proposed orders by April 10, 2026. Petitioner sought a one-day extension to file a proposed order, which was unopposed and granted. The Final Order deadline, based on the expedited timelines in the IDEA, is April 15, 2026.

On April 10, 2026, the date the proposed orders were due, the School Board filed a request for Official Recognition of "Supporting Students with Disabilities and Avoiding the Discriminatory Use of Student Discipline under Section 504 of the Rehabilitation Act of 1973, U.S. Department of Education, Office for Civil Rights, July 2022, Website page." The School Board asked the undersigned to review and consider a 42-page OCR Letter providing guidance on Section 504. The undersigned, however, may not consider new evidence

that the School Board did not present at the hearing, or disclose to Petitioner by the disclosure deadline.

Unless otherwise indicated, all rule and statutory references are to the version in effect at the time of the alleged violations. For stylistic convenience, the undersigned will use male pronouns in this Final Order when referring to Petitioner. The male pronouns are neither intended, nor should be interpreted, as a reference to Petitioner's actual gender.

FINDINGS OF FACT

1. The student is in eleventh-grade and is eligible for a 504 Plan due to his diagnoses of attention deficit/hyperactivity disorder (ADHD) and generalized anxiety. Prior to the incident in November 2025, the student attended Alexander W. Dreyfoos School of the Arts (Dreyfoos), a public magnet high school serving artistically talented students. He is a trumpet player and a high achieving student, earning mostly As in advanced, college-level coursework.

2. He has been eligible for a 504 Plan since middle school. The 504 Plan that was in effect in November 2025 listed both of his diagnoses and provided for accommodations in two separate categories. In "General Accommodations," the student needed to be placed in an area of the room with the least distractions, daily, and in all classes. He was also entitled to short breaks between assignments, cues to stay on task, a chance to demonstrate understanding of directions before beginning a task, use of outlines or copies of notes, have large assignments broken down into smaller segments, turn in assignments in typewritten or computer-generated form, additional time for homework assignments, and take short breaks between assignments in every class.

3. In the category of "Classroom and Statewide Test Accommodations," he was entitled to flexible setting, responding, presentation, and scheduling.

Specifically, he was to be placed in an area with few distractions, could give responses that were typewritten or computer-generated, receive cues to stay on task, receive 50 percent extended time, and could take breaks during test sessions.

4. The 504 Plan made no mention of maladaptive behaviors, nor did it include a behavior plan of any type.

5. Up until November of 2025, his time at Dreyfoos was challenging both academically and artistically—he was a band member with a demanding music curriculum. He had never received a referral for maladaptive behavior, and no one had ever requested that his behavior be assessed or that a behavior plan be developed. And no one, either at home or at school, had witnessed the student suffering a panic attack.

6. The teachers describe a rigorous curriculum that, naturally, would cause stress and anxiety in all students. He had unfortunately received some insulting and degrading remarks from Dreyfoos teachers on a couple of occasions, but those confrontations were isolated and had occurred during the prior academic year. Since then, he continued to succeed, at a high level, in all musical and academic endeavors, despite the pressure and stress they undoubtedly produced.

7. During the lunch block on November 14, 2025, Assistant Principal Dawson saw a student walking into an area of the gym, which was not supposed to be accessible to the students during lunch. When he approached, he saw Petitioner and another boy exit the locker room from different doors, and he stopped them. Petitioner had, in his eyeglass case, two vape devices. During Mr. Dawson's investigation, Petitioner stated that the vape devices belonged to the other student and that the other student had more paraphernalia in another location—Mr. Dawson checked out Petitioner's story, and it turned out to be unverifiable. Petitioner denied that the vape devices were his until he wrote a statement about the incident; and, at that point, his mother was by his side.

6

8. One vape device contained nicotine, and the other contained tetrahydrocannabinol (THC). It is undisputed that both vape devices belonged to Petitioner and that he possessed them on school grounds. Because this possession is a Level Three violation of the COSC, he was suspended for five days.

9. Five days after the incident, on November 19, 2025, the Dreyfoos staff held what is termed an "Exit Meeting"—where a team of staff, the parents, and the student gather to decide whether a student will be recommended for exit from the 100% choice school. This meeting is mandatory when a student commits a Level Three infraction. The exit meeting, by all accounts, was an emotional gathering of many who were surprised and saddened by the situation. The student was contrite and he apologized for his actions. He agreed that he had participated and signed acknowledgment of a "PBIS" lesson on vaping, drinking and illegal substances, every year of high school. That lesson included the consequences of possessing a vape device on campus, which was a possible exit from Dreyfoos and a return to a student's home school. He also admitted to having brought the vape devices onto the school campus multiple times.

10. The exit team recommended exit from Dreyfoos, which meant that, because he was a student with a 504 Plan, he could not be "exited" from Dreyfoos until after a manifestation determination review (MDR) meeting was held. If the MDR team determined that the conduct was a manifestation of the student's disability, the student would not be "exited" from Dreyfoos. If the MDR team determined that the conduct was not a manifestation of the student's disability, he would exit Dreyfoos.

11. The MDR meeting was held on December 1, 2025. It lasted about 2.5 hours, and the parents brought the student's treating psychiatric nurse, Dr. Rocklage, and an attorney with them. Dr. Rocklage had been treating the student for a year and a half. He shared that the student's ADHD and anxiety interact in a negative feedback loop, which can often result in poor

7

decision-making and impulsivity. In his letter written at the time of the MDR, he wrote:

> ADHD is characterized by persistent patterns of inattention, impulsivity, and/or hyperactivity that interfere with functioning across multiple domains. [**] demonstrates symptoms including reduced sustained attention, impaired executive functioning, distractibility, difficulty initiating tasks, and inconsistent regulation of focus and effort. These symptoms directly contribute to challenges in academic environments, such as difficulty following extended instruction, maintaining attention during coursework, organizing academic responsibilities, and demonstrating [his] capabilities consistently.

> [**] additionally meets diagnostic criteria for Generalized Anxiety Disorder, which is marked by excessive and pervasive worry, restlessness, somatic tension, difficulty concentrating, and mental fatigue. In [his] case, anxiety symptoms exacerbate the cognitive effects of ADHD, often intensifying distractibility and interfering with [his] ability to manage academic demands. The combined impact of these disorders results in increased cognitive load and reduced functional efficiency in academic settings.

> *   *   *

> ***In my clinical opinion, [**] ADHD and Generalized Anxiety Disorder significantly impair [his] impulse control, judgment, and coping***, and these impairments directly contributed to [his] use of nicotine and THC and to [his] decision to bring these substances to school.

(emphasis added).

12. Dr. Kerzner, the school psychologist, opined that although the student has diagnoses of ADHD and anxiety, the specific conduct, possession of THC and nicotine vapes on campus, did not have a direct or substantial link to his disabilities. She pointed out that there was no evidence that, because of his disability, he was unable to understand and follow school rules regarding

possession of vape devices. She opined that ADHD-related impulsivity or distractibility, as well as anxiety symptoms, do not substantially relate to the student's choice to possess prohibited items at school. She highlighted the fact that the student had purchased, concealed, and brought the substance onto campus multiple times, suggesting that the behavior was deliberate decision-making and not the result of impulsive, disability-related decision-making.

13. The notes of the MDR meeting reflect that the parents agreed with the staff that the teachers had implemented the 504 Plan as written, which is supported by the teacher input that was provided at the MDR meeting. In addition, Petitioner presented no persuasive evidence that the school staff failed to implement the 504 Plan at Dreyfoos. It is worth repeating that the 504 Plan for this student contained no behavioral plan, as there had never been a need for one.

14. After hearing from everyone at the meeting, the MDR team reached a consensus, which the parents and Dr. Rocklage disagreed with, that the act of possessing vape pens on the school campus was not a manifestation of the student's disability.

15. After the MDR meeting, the student was "exited" from Dreyfoos, and enrolled at his home high school.

16. The more persuasive evidence in this case establishes that the student's conduct, which was possession of prohibited items on the school campus, was not a manifestation of his disabilities. To the extent that the two professionals, Dr. Kerzner and Rocklage, disagree on this question, the undersigned finds Dr. Kerzner's opinion to be supported by the record evidence, and more persuasive.

17. Petitioner also argued that the order of meetings, that is, the exit meeting, followed by the MDR meeting, then followed by the exit determination, was flawed. The evidence establishes that this procedure complies with Section 504 and the Dreyfoos staff properly followed it.

9

18. Lastly, Petitioner argued that the MDR determination was predetermined. Petitioner failed to present any persuasive evidence establishing this claim. The MDR and exit meeting notes, together with the testimony at the hearing, establish that both meetings were lengthy and all participants were actively involved, and their opinions considered. To the extent that there are differing views on this issue, from the MDR participants who testified, the undersigned finds the school-based team MDR members' testimony to be more credible and supported by the record as a whole.

CONCLUSIONS OF LAW

19. DOAH has jurisdiction over the subject matter of this proceeding and of the parties. *See* § 120.65(6), Fla. Stat.

20. Petitioner bears the burden of proof on the claim raised in the Complaint. *Schaffer v. Weast*, 546 U.S. 49, 62 (2005); Dep't of Educ., Assistance to States for the Education of Children with Disabilities, 71 Fed. Reg. 46724 (Aug. 14, 2006) (explaining that the parent bears the burden of proof in a proceeding challenging a school district's manifestation determination).

21. Section 504 is an anti-discrimination statute. The statutory text is short and straightforward, and provides:

> No otherwise qualified individual with a disability in the United States, as defined in section 705(20) of this title, shall, solely by reason of her or his disability, be excluded from the participation in, be denied the benefits of, or be subjected to discrimination under any program or activity receiving Federal financial assistance or under any program or activity conducted by any Executive agency or by the United States Postal Service. The head of each such agency shall promulgate such regulations as may be necessary to carry out the amendments to this section made by the Rehabilitation, Comprehensive Services, and Developmental Disabilities Act of 1978.

10

29 U.S.C. § 794(a).

22. Section 504 incorporates the Americans with Disabilities Act (ADA).[2] 29 U.S.C. § 794(d). The Department of Education has promulgated regulations to implement Section 504. First, 34 C.F.R. § 104.4(a) reiterates Section 504's textual prohibition by providing that "[n]o qualified handicapped person shall, on the basis of handicap, be excluded from participation in, be denied the benefits of, or otherwise be subjected to discrimination under any program or activity which receives Federal financial assistance."

23. Section 504's regulations further set forth the discriminatory actions prohibited. Title 34 C.F.R. § 104.4(b) delineates the prohibited discriminatory actions:

> (1) A recipient, in providing any aid, benefit, or service, may not, directly or through contractual, licensing, or other arrangements, on the basis of handicap:
>
> (i) Deny a qualified handicapped person the opportunity to participate in or benefit from the aid, benefit, or service;
>
> (ii) Afford a qualified handicapped person an opportunity to participate in or benefit from the aid, benefit, or service that is not equal to that afforded others;
>
> (iii) Provide a qualified handicapped person with an aid, benefit, or service that is not as effective as that provided to others;
>
> (iv) Provide different or separate aid, benefits, or services to handicapped persons or to any class of handicapped persons unless such action is necessary to provide qualified handicapped persons with aid, benefits, or services that are as effective as those provided to others;

---

[2] 42 U.S.C. § 12101, *et seq.*

(v) Aid or perpetuate discrimination against a qualified handicapped person by providing significant assistance to an agency, organization, or person that discriminates on the basis of handicap in providing any aid, benefit, or service to beneficiaries of the recipient's program or activity;

(vi) Deny a qualified handicapped person the opportunity to participate as a member of planning or advisory boards; or

(vii) Otherwise limit a qualified handicapped person in the enjoyment of any right, privilege, advantage, or opportunity enjoyed by others receiving an aid, benefit, or service.

24. In addition, Section 504 requires a school district to provide a free appropriate public education (FAPE) to each qualified disabled student who is in the school district's jurisdiction, regardless of the nature or severity of the student's disability. For the purpose of this subpart, the provision of FAPE is the provision of regular or special education and related aids and services that are designed to meet the student's educational needs as adequately as the needs of nondisabled students are met. *See* 34 C.F.R. § 104.33(a) and (b)(1)(i).

25. School districts have certain limitations on their ability to remove disabled children from their educational placement following a behavioral transgression. Although the term "manifestation determination" does not appear in the regulatory language of Section 504, the Office for Civil Rights has interpreted Section 504 as requiring an MDR in connection with disciplinary actions that constitute a "significant change in placement" under 34 C.F.R. § 104.35, and the School Board's policies here provide the same.

26. The process and relevant inquiry when conducting an MDR is in the IDEA, 20 U.S.C. § 1415(k)(1)(E):

12

Manifestation determination.

(i) In general. Except as provided in subparagraph (B), within 10 school days of any decision to change the placement of a child with a disability because of a violation of a code of student conduct, the local educational agency, the parent, and relevant members of the IEP Team (as determined by the parent and the local educational agency) shall review all relevant information in the student's file, including the child's IEP, any teacher observations, and any relevant information provided by the parents to determine—

(I) if the conduct in question was caused by, or had a direct and substantial relationship to, the child's disability; or

(II) if the conduct in question was the direct result of the local educational agency's failure to implement the IEP.

27. If the behavior that gave rise to the violation of the school code is determined not to be a manifestation of the child's disability, the school district may apply the relevant disciplinary procedures in the same manner and duration as would be applied to children without disabilities. 34 C.F.R. § 300.530(c).

28. Applying these standards, the more persuasive evidence established that the conduct that resulted in discipline, which was a planned, multi-step process, was not caused by, or have a direct and substantial relationship to, his ADHD or generalized anxiety. In addition, there was no persuasive evidence establishing that the conduct was the direct result of the school staff's failure to implement the student's 504 Plan.

29. Petitioner also did not present persuasive evidence establishing any irregularities in the MDR process or that the MDR decision was predetermined.

ORDER

Based on the foregoing Findings of Fact and Conclusions of Law, it is ORDERED that Petitioner failed to establish that the conduct, which resulted in discipline, was a manifestation of the student's disabilities. All requests for relief are DENIED.

DONE AND ORDERED this 15th day of April, 2026, in Tallahassee, Leon County, Florida.

*J.E. Varn*

JESSICA E. VARN
Administrative Law Judge
DOAH Tallahassee Office

Division of Administrative Hearings
2001 Drayton Drive
Tallahassee, Florida  32311
(850) 488-9675
www.doah.state.fl.us

Filed with the Clerk of the
Division of Administrative Hearings
this 15th day of April, 2026.

COPIES FURNISHED:

Bryce D. Milton, Educational Program Director
(eServed)

Stephanie Langer, Esquire
(eServed)

William D. Chappell, General Counsel
(eServed)

Laura E. Pincus, Esquire
(eServed)

Michael J. Burke, Superintendent
(eServed)

14

15

### NOTICE OF RIGHT TO JUDICIAL REVIEW

This decision is final unless, within 90 days after the date of this decision, an adversely affected party:

> a) brings a civil action in the appropriate state circuit court pursuant to section 1003.57(1)(c), Florida Statutes (2014), and Florida Administrative Code Rule 6A-6.03311(9)(w); or
> b) brings a civil action in the appropriate district court of the United States pursuant to 20 U.S.C. § 1415(i)(2), 34 C.F.R. § 300.516, and Florida Administrative Code Rule 6A-6.03311(9)(w).